IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| **JOHN DOE,** *a minor, by and through his Mother and next friend*, **SHARIEKA FRAZIER, on behalf of himself and all others similarly situated** | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:16-cv-0799 |
| **BONNIE HOMMRICH,** *in her official capacity as the Commissioner of the Tennessee Department of Children's Services*, **THE TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES, RUTHERFORD COUNTY, TENNESSEE, LYNN DUKE,** *in her individual and official capacity as Director of the Rutherford County Detention Facility* and **LIEUTENANT ANGELA ISTVANDITSCH,** *in her individual and official capacity as an officer of the Rutherford County Juvenile Detention Facility,* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Trauger<br><br>Magistrate Brown |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION
## AGAINST DEFENDANTS RUTHERFORD COUNTY AND LYNN DUKE

Plaintiff, through undersigned counsel, submits this memorandum in support of Plaintiff's

Motion for a Preliminary Injunction.

### INTRODUCTION

Plaintiff, a juvenile, for himself and the putative classes, is suing Defendants to prevent

continued imposition of cruel and unusual punishment in the form of punitive solitary confinement

of children. Defendants subjected Plaintiff to multiple periods of solitary confinement covering several days, and only stopped after this Court issued a Temporary Restraining Order that required its cessation.

Plaintiff asks this Court for a preliminary injunction because Defendants' policies and practices constitute an ongoing violation of the proposed **Rutherford County Detainee Class** members' constitutional rights that has caused and shall continue to cause irreparable harm. The Eighth Amendment, as applied to the states through the Fourteenth Amendment, protects all Class members' right to be free from this inhumane treatment while in government custody.

## STATEMENT OF FACTS

**A. John Doe.**

On March 18, 2016, the Juvenile Court for Rutherford County, Tennessee ordered John Doe detained at the Rutherford County Juvenile Detention Facility ("RCJDC") while he awaited adjudication on a delinquency petition. During his detention, County Defendants placed Doe in solitary confinement on multiple occasions. *Loss of Privilege Details and Incident Reports,* previously filed under seal as Doc. 96 at Plaintiffs_Class_Reply_000208-225; *Declaration of John Doe* Doc. 22-1. On April 20, 2016, County Defendants began a period of confinement it labeled "indefinite". *Juvenile Court Orders,* previously filed as Doc. 26-1, 26-2, 26-3. The confinement included seclusion/isolation for 23 hours a day with no books or other materials, and with the window to his cell covered with a board. Defendants released John Doe from his unlawful confinement after this Court issued a Temporary Restraining Order requiring his release on April 25, 2016. *Id. See also* Temporary Restraining Order, Doc. 8.

2

Case 3:16-cv-00799   Document 99   Filed 02/09/17   Page 2 of 18 PageID #: 3049

**B. Rutherford County's Historic Policy of Punitive Isolation.**

Through September of 2016, the RCJDC's Standard Operating Procedures had an explicit policy that mandated solitary confinement of juveniles for even minor infractions of Facility rules. RCJDC's SOPs describes "confinement" as a "method of behavior management" defined as "placing a detainee in a designated room by him or herself for a period of time. Confinement may be used to . . . discipline a detainee for violations of facility rules." The policy further places the following restrictions on detainees while in "confinement":

1) "detainees are not allowed contact with the general population";

2) "A window board shall be placed over the detainee's window";

3) "Detainees on confinement will not be eligible to receive recreation time or leisure time.";

4) "Educational services may be taken from the detainee if they are deemed a threat"; and

5) "detainees will not be allowed to have any reading material …[except] their Bible".

*RDJDC Standard Operating Procedures updated September 2015,* PageID #: 1985-1988, Doc. 94-3.

The policy places certain rules violations on a "behavioral continuum" and mandates "confinement" for specific lengths of time, starting at twelve hours, or for an indefinite period of time, based on where the behavior falls on the continuum or whether the infraction represents repeated violations of the rules. The SOPs include 24 rules that land children in this confinement, including a failure "to follow all instructions given by staff" and "touching t.v.'s". *Id.*

**C. Rutherford County's Illusory Policy Change.**

RCJDC had maintained this explicit, mandatory policy of punitive isolation for juveniles for years. *See, e.g., RDJDC Standard Operating Procedures updated September 2008* Exhibit A

at Plaintiffs_Motion_Injunction_00212-214. After Plaintiff filed this lawsuit, however, the County modified the language of the SOPs related to behavioral management. Unfortunately, the County only changed the words, not the actual practices.

Instead of "confinement", the revised policy refers to "Loss of Privileges" as "one way to create detainee accountability". *RDJDC Standard Operating Procedures updated September, 2016* at PageID #: 2103-2105, Doc. 94-4. Just like the previous policy that used the word "confinement", the updated policy on "Loss of Privileges" mandates that "repeated violations of a rule shall increase one level for each subsequent violation" and the levels are set forth as lengths of time up to three days. *Id.* The new policy continues to allow the withholding of visitation, religious services, mail, telephone, education or meal services, or leisure and recreation if staff feels that there "has been repeated or major rule violations". *Id.*

There is no meaningful difference between the prior and current policies on discipline of children at RCJDC. Whereas the previous policy explicitly defined "Confinement" in terms of isolating a child from his peers, the new policy fails to explain what is meant by "Loss of Privileges." However, a cursory review of the old and new policies, simply holding them side by side, reveals that they are largely the same policies with the word "confinement" replaced with the phrase "Loss of Privileges". Moreover, testimony from Defendants reveals that the words "lockdown", confinement" and "loss of privileges" have "basically the same meaning". Depo. of Istvanditsch, Doc. 22-1 at 12-13; Depo. of Duke, Doc. 20-1 at 10. Indeed, every time RCJDC enforced the previous "Confinement" policy, it completed a "Loss of Privileges" form. *Loss of Privileges Details and Incident Reports*, previously filed under seal as Doc. 96. On these forms, and the Behavior Level Logs that list periods of confinement for the children, the staff refer to periods of isolation only by the phrases "Loss of Privileges" or "Lockdown". Moreover, when

4

describing the hundreds of periods of "Loss of Privileges" enforced over the last several months, staff only describes "Loss of Privileges" in periods of time, not withholding of an actual privilege, in direct keeping with the same punitive confinement policy the RCJDC has followed for years. *Loss of Privilege Details and Incident Reports,* previously filed under seal Doc. 96, at Plaintiffs_Class_Reply_000208-225. It is apparent that the privilege lost is the privilege to have meaningful contact with peers.

In short, the RCJDC has always maintained a policy of punitive isolation of children in its custody, and still does.

### D. John Doe Was the Tip of The Iceberg—Rampant Juvenile Solitary Confinement

The County avoided an initial preliminary injunction in this case by relying on the fact that the named plaintiff (not acting as a class representative at that time) had been released from solitary confinement by the time of the hearing. *Order Denying Preliminary Injunction,* Doc. 30. Since that hearing, the County has placed children in isolation hundreds of times. Through its own documentation, RCJDC placed 121 children in isolation between March 17 and October 7, 2016. Many of these children faced multiple periods of isolation. For that same period of time, the logs show 351 separate events of isolation, varying in length from 12 hours to several days to indefinite. These same logs also show events listed as "confinement/time out" that describe events where a child is isolated to help the child de-escalate or calm down, a practice Plaintiff concedes is appropriate. In any event, to the extent that the County attempts to argue that "Loss of Privileges" is something other than isolation, its own logs, especially with the context of its written policies, contradict that claim.

5

## ARGUMENT

As discussed below, an analysis of the four-factor test governing the issuance of preliminary injunctions demonstrates that the Court should grant preliminary injunctive relief during the pendency of these proceedings.

## I. THE PRELIMINARY INJUNCTION STANDARD AND PURPOSE.

Generally, courts consider four factors when deciding whether to issue a preliminary injunction. The four factors are:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable harm without the injunction;

(3) whether issuance of the injunction would cause substantial harm to others;

(4) whether the public interest would be served by the issuance of the injunction.

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *see also Barber v. Dearborn Pub. Sch.*, 286 F. Supp. 2d 847, 851 (E.D. Mich. 2003). Courts balance these four factors in their analysis, as no single factor is dispositive. *Barber*, 286 F. Supp. 2d at 851 *(citing Neveux v. Webcraft Tech., Inc.*, 921 F. Supp. 1568, 1570-71 (E.D. Mich. 1996) (*citing Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995))*.

### A. THE PLAINTIFF CLASSES HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

The Classes have a very strong likelihood of succeeding on their Eighth and Fourteenth Amendment claims. "The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'" *Barker v. Goodrich,* 649 F.3d 428, 434 (6th Cir.2011). Fundamentally, the "'concept underlying the Eighth Amendment ...

is nothing less than the dignity of [hu]man[kind].'" *Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (quoting *Trop v. Dulles,* 356 U.S. 86, 100 (1958)).

Success on 8th Amendment claims "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency"—that is, it "is not one that today's society chooses to tolerate." *Helling v. McKinney,* 509 U.S. 25, 36 (1993). Furthermore, in Eighth Amendment jurisprudence, "an assessment of contemporary values concerning the infliction of a challenged sanction is relevant." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976).

Conditions of confinement may deprive prisoners of the minimal civilized measures of life's necessities. *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Deprivation of activity, exercise, mental stimulation and activity, at some level, is the denial of a basic human necessity. *See Wilson v. Seiter,* 501 U.S. 294, 304 (1991). The test for determining "cruel and unusual" conditions of confinement is dynamic. It depends not on hard and fast rules, but upon "civilized standards, humanity and decency." *Estelle,* 429 U.S. at 102, 97 S. Ct. 285. A court must turn then to the "evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346.

In the instant case, John Doe and other class members have a right to be free from cruel and unusual punishment or inhumane treatment under the Eighth and Fourteenth Amendments. Evolving notions of decency. the overwhelming weight of scientific opinion and the weight of legal authority hold that solitary confinement of juveniles constitutes such inhumane treatment. Furthermore, Defendants have proffered no legitimate, rehabilitative reason for lengthy isolation of juveniles with no contact with peers, educational materials or mental health professionals as a response to facility rules violations.

**1. Terminology.**

The County Defendants have repeatedly complained that Plaintiff cannot define the term "solitary confinement" so the Court cannot enjoin the ill-defined practice. However, the term has been repeatedly used and defined by courts, scientific authorities, international bodies and other entities. Finally, Plaintiff seeks an injunction against the practice, not the term, and encourages the Court to set parameters around the prohibited practice as it sees fit.

Until recently, RCJDC's own policies defined "confinement" as a "method of behavior management" that involves "placing a detainee in a designated room by him or herself for a period of time" during which "detainees are not allowed contact with the general population". The State of Tennessee's Administrative Policies define "seclusion" as "the confinement of a child/youth alone in a room or an area where the child/youth is prevented from leaving" or "separation of the child/youth from other persons." *Admin. Pol. & Pro. 19.11,* Doc. 49-1. The State's proposed Rulemaking continues this definition and emphasizes that "seclusion" includes "separation of youth from other persons." *See* Docket 84-6. The American Academy of Child & Adolescent Psychiatry says that "Solitary confinement is defined as the placement of an incarcerated individual in a locked room or cell with minimal or no contact with people other than staff of the correctional facility." *See* Solitary Confinement of Juveniles, American Academy of Child & Adolescent Psychiatry, http://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx, attached at Exhibit B. In *United State v. Ohio,* the parties agreed to prohibit disciplinary seclusion and included the following definition in their Agreed Order: "Seclusion," seclude," and "secluding" mean isolating a youth in a room from which the youth's ability to egress is blocked. The term seclusion does not apply to locking a youth in a room during normal hours of sleep."

Exhibit C. Furthermore, Dr. Thomas Schacht, who holds a doctorate in clinical psychology from Rutgers University and has studied related issues since 1973, opined that "[a]t a fundamental level, it is the state of being kept alone, away from other detainees, typically in a correctional facility of some kind." *See* Depo. of Dr. Schacht, Doc. 84-2, attached as Exhibit D, at 49-50.

In short, Plaintiff seeks protection not against the phrase "solitary confinement", but from the practice of isolating children from their peers as a punitive or disciplinary measure, regardless of the label.

**2. Case Law Supports Plaintiff's Likelihood of Success.**

*a. Juveniles deserve increased protection under the 8th Amendment.*

In recent years, the United States Supreme Court has stepped in to protect children from society's most severe treatment of prisoners. In short, children are different than adults, and 8th Amendment analysis requires consideration of those differences. *See Graham v. Florida*, 560 U.S. 48 (2010) (prohibiting life without parole for juveniles)*; Roper v. Simmons,* 543 U.S. 551 (2005) (prohibiting death penalty for children).

In *Miller v. Alabama*, Justice Kagan described this developing area of jurisprudence:

> Children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." *Graham*, 560 U.S., at ——, 130 S.Ct., at 2026. Those cases relied on three significant gaps between juveniles and adults. First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S. at 569. Second, children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.,* at 570.
>
> Our decisions rested not only on common sense—on what "any parent knows"— but on science and social science as well. *Id*., at 569. In *Roper,* we cited studies

showing that " '[o]nly a relatively small proportion of adolescents' " who engage in illegal activity " 'develop entrenched patterns of problem behavior.' " *Id.*, at 570 (*quoting* Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003). And in *Graham*, we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." 560 U.S., at ——, 130 S.Ct., at 2026. We reasoned that those findings— of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.' " *Id.* (*quoting Roper*, 543 U.S. at 570.

*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because "[t]he heart of the retribution rationale" relates to an offender's blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.' " *Graham*, 560 U.S., at ——, 130 S.Ct., at 2028 (*quoting Tison v. Arizona*, 481 U.S. 137, 149 (1987); *Roper*, 543 U.S. at 571. Nor can deterrence do the work in this context, because " 'the same characteristics that render juveniles less culpable than adults' "—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. *Graham*, 560 U.S., at ——, 130 S.Ct., at 2028 (*quoting Roper*, 543 U.S. at 571).

132 S. Ct. 2455, 2464-65 (2012) (citations in original).

### *b. Solitary confinement is agonizing even for adults.*

In his concurring opinion in *Davis v. Ayala*, Justice Kennedy observed that "The human toll wrought by extended terms of isolation long has been understood". 135 S.Ct. 2187, 2209 (2015). Indeed, "[o]ne hundred and twenty-five years ago, [the Supreme Court] recognized that, even for prisoners sentenced to death, solitary confinement bears 'a further terror and peculiar mark of infamy.'" *Id. (quoting In re Medley*, 134 U.S. 160, 170 (1890); *see also Medley*, 134 U.S. at 168 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition ... and others became violently insane; others, still, committed suicide")."

10

### c. Punitive solitary confinement in other cases of diminished capacity violates the 8th Amendment

Several cases have concluded that the practice is unconstitutional as applied to other individuals with diminished mental capacity: the mentally ill. Courts that have considered the solitary confinement of individuals with serious mental disabilities have found the practice to be unconstitutional. *See, e.g.*, *Ruiz v. Johnson*, Southern Federal District Court of Texas, 1999 (37 F. Supp. 2d. 855, 915 (S.D. Tex. 1999)), rev'd on other grounds, *Ruiz v. Johnson*, Fifth Circuit Federal Court of Appeals, 2001 (243 F.3d 941 (5th Cir. 2001)), adhered to on remand, *Ruiz v. Johnson*, Southern Federal District Court of Texas, 2001 (154 F. Supp. 2d 975 (S.D. Tex. 2001)) ("Conditions in TDCJ-ID's administrative segregation units clearly violate constitutional standards when imposed on the subgroup of the plaintiff's class made up of mentally-ill prisoners); *Coleman v. Wilson*, 912 F.Supp. 1282, 1320-21 (E.D. Cal. 1995); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995); *Casey v. Lewis*, 834 F. Supp. 1477, 1549-50 (D. Ariz. 1993); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1988).

### d. Cases throughout the country raising the issue have resulted in prohibitions of punitive solitary confinement of juveniles.

Cases all over the country have litigated the issue of the constitutionality of punitive isolation of juveniles, and the cases have uniformly resulted in prohibition of the practice. *See e.g. United States. v. Hinds Cnty.*, No. 16-489 (S.D. Miss. July 19, 2016), ECF No. 8-1 at 37-38, https://www.justice.gov/crt/file/883861/download (investigation and subsequent consent decree in which the Jail agreed to eliminate solitary confinement as a disciplinary sanction for juveniles) attached at Exhibit E; *United States v. Ohio*, No. 04-1206 (S.D. Ohio May 21, 2014), ECF No. 148 at 2, https://www.justice.gov/sites/default/files/crt/legacy/2014/06/30/ohiojuv_order_5-21-14.pdf (investigation and subsequent consent decree in which the facilities agreed to eliminate

disciplinary solitary confinement for juveniles) attached at Exhibit C; *United States v. Leflore Cnty.*, No. 15-00059 (N.D. Miss. May 13, 2015), ECF No. 3-1 at 10-12, https://www.justice.gov/sites/default/files/crt/legacy/2015/05/14/leflore_agreement_5-13-15.pdf (investigation and subsequent consent decree in which the facility agreed to eliminate disciplinary solitary confinement for juveniles) attached at Exhibit F; *United States v. City of New York,* No. 1:11-cv-05845, Doc. 209-1, https://www.justice.gov/opa/file/624846/download (investigation and consent decree between federal government and subsequent consent decree including requirement that New York cannot "place Inmates under the age of 18 in Punitive Segregation or Isolation") attached at Exhibit G.

### 3. Science and International Standards

The scientific community and international law further support Plaintiff's position, and are relevant considerations in juvenile 8th Amendment analysis. *Roper*, 543 U.S. at 569-70.

International Authorities uniformly express outrage against the use of solitary confinement for juveniles. With regard to solitary confinement, the United Nations Guidelines for the Prevention of Juvenile Delinquency (Riyadh Guidelines) describe punitive solitary confinement of young people under age 18 as cruel, inhuman, or degrading treatment. The Committee on the Rights of the Child, which interprets the CRC, has also suggested that the punitive solitary confinement of young people under age 18 is cruel, inhuman, or degrading treatment. The United Nations Rules for the Protection of Juveniles Deprived of their Liberty reiterates this conclusion. The United Nations special rapporteur on torture, in his report to the General Assembly, called for an absolute ban on solitary confinement for young people under age 18: "The Special Rapporteur holds the view that the imposition of solitary confinement, of any duration, on juveniles is cruel,

inhuman or degrading treatment and violates article 7 of the International Covenant on Civil and Political Rights and article 16 of the Convention Against Torture."

The extensive research conducted in prison systems throughout the United States and in many other countries is "remarkably consistent" in its findings that prolonged solitary confinement inflicts "deleterious psychological effects." Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel & Far Too Usual Punishment*, 90 Ind. L. J. 741, 756 (2015) *see also* Hernán Reyes, *The worst scars are in the mind: psychological torture*, 89 Int'l Rev. of the Red Cross, No. 867, 591, 607 (Sept. 2007) ("Being confined for prolonged periods of time alone in a cell has been said to be the most difficult torment of all to withstand.").

The well-established psychological harms inflicted by solitary confinement are a direct result of its inherent characteristics: "isolation" from other people, lack of meaningful perceptual stimulation, and extreme "idleness" resulting from the denial of any productive activities. *See* Terry Kupers, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?*, Routledge Handbook of Int'l Crime & Just. Stud., 5-6 (2013). As explained by Dr. Terry Kupers, "[h]uman beings require at least some social interactions and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality." *Id.* at 6. When a person is deprived of meaningful social contact and activity, "unrealistic ruminations and beliefs cannot be tested" and "are transformed into unfocused and irrational thoughts." *Id.* "Internal impulses" grow to "overwhelming proportions," without check, and "[d]isorganized behaviors emerge." *Id.* at 5.

Recognizing the direct link between solitary confinement and the harms it causes, experts advise that "the inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of *all who are held in solitary*

13

*confinement*." National Commission on Correctional Health Care Position Statement: Solitary Confinement (Isolation), 1, 2 (Apr. 2016) (emphasis added). Even previously healthy, stable inmates—not just those with preexisting mental illness—predictably will deteriorate psychologically in isolation. After all, "[t]he psychological distress and suffering caused by solitary confinement" is often the reason for doing it, "not an unintended side effect." Kenneth Appelbaum, *Am. Psychiatry Should Join the Call to Abolish Solitary Confinement*, 43 J. Am. Acad. Psychiatry & L. 406, 410 (2015).

Inmates subjected to the profound stresses of solitary confinement exhibit a "strikingly consistent" set of "psychiatric symptoms," recorded in decades of case studies, articles, and personal accounts. Bennion, *Banning the Bing* at 757; *see also* Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, 34 Crime & Just. 441, 488 (2006) ("[A] significant percentage of prisoners subjected to solitary confinement suffer from a similar range of symptoms irrespective of differences in the physical conditions in various prisons and in the treatment of isolated inmates." (collecting studies)).

Dr. Craig Haney, a preeminent expert on the psychological harms of solitary confinement, has catalogued these harms: "anxiety," "panic," "withdrawal," "hypersensitivity," "ruminations," "cognitive dysfunction," "hallucinations," "loss of control," "irritability," "aggression, and rage;" "paranoia;" "depression," "a sense of impending emotional breakdown," "self-mutilation," and "suicidal ideation and behavior." *See* Craig Haney, Mental Health Issues in Long Term Solitary and "Supermax" Confinement, 49 Crime & Delinq. 124, 1130-31 (2003) (collecting dozens of studies); *see also* Bennion, *Banning the Bing* at 757. "Even those without a prior history of mental illness" are at serious risk of developing these precise symptoms. NCCHC, *Position Statement* at 2 (listing virtually identical symptoms).

14

The science has mostly studied the effects of isolation on adult inmates. Of course, young people are even less psychologically able than adults to handle solitary confinement. Youth are also psychologically different than adults. They experience time differently (a day for a child feels longer than a day to an adult) and have a greater need for social stimulation. Experts, such as the American Academy of Child and Adolescent Psychiatry, believe that, due to their "developmental vulnerability," adolescents are particularly at risk of adverse reactions. The Department of Justice found that more than 50% of the suicides of children detained in juvenile facilities occurred while youth were confined alone in their room (a form of solitary confinement) – and that more than 60% of young people who committed suicide had a history of being held in isolation.

Accordingly, the case law, international law and science all point toward Plaintiff's likelihood of success on the merits.

## B. PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF

The second prong of the preliminary injunction test – whether the movant would suffer irreparable harm without injunctive relief – also supports entry of a temporary injunction. The loss of constitutional rights, even for a short amount of time, is presumed to constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, the literature cited above supports the idea that Class Members will suffer increasing harm for each hour any of them spend in solitary confinement, and that the harm may not be undone.

## C. A PRELIMINARY INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO OTHERS

The third prong of the test – whether a preliminary injunction would cause substantial harm to others – clearly weighs in favor of issuing an injunction. Defendants have not and cannot identify any way in which their interests (or the interests of anyone else) would be harmed if they

15

Case 3:16-cv-00799   Document 99   Filed 02/09/17   Page 15 of 18 PageID #: 3062

are prevented from isolating children for disciplinary or punitive purposes. During the pendency of this litigation, the State has issued directives and proposed a rule to prohibit similar confinement, indicating that such confinement can be ended without substantial harm. *See* Doc. 46-4, at 1; Doc. 46-6. Indeed, based on the literature, harm to others, including the juveniles but also the rest of society, appears to be caused by the confinement, not its cessation.

### *D. A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST*

The final prong of the test – the public interest – also strongly supports granting preliminary injunctive relief. The protection of constitutionally protected rights always serves the public interest. Indeed, "protection of constitutional rights … ***is always in the public interest***." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979) (emphasis added), and *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994))*; see also Barber*, 286 F. Supp. 2d at 859-60 and *Chambers*, 145 F. Supp. 2d at 1073. Protection of our children would seem to fall into the same category—always in the public interest.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks this Court to enter a preliminarily injunction, enjoining Defendants Lynn Duke and Rutherford County from placing juveniles in solitary confinement, or otherwise isolating them from meaningful contact with their peers, as punishment or discipline.

Respectfully Submitted,

/s/Mark J. Downton
Mark J. Downton, #020053
Wesley B. Clark, #032611
*ACLU Cooperating Attorney*
**DOWNTON CLARK, PLLC**
2706 Larmon Drive
Nashville, Tennessee 37204
(615) 984-4681
mark@downtonclark.com
wesley@downtonclark.com

/s/ Thomas H. Castelli
Thomas H. Castelli, #024849
Legal Director
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
(615) 320-7142
tcastelli@aclu-tn.org

# CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2017, a copy of the foregoing document and attachments was filed electronically and forwarded via the U.S. District Court's electronic filing system to:

Josh McCreary
Nicholas C. Christiansen
**Hudson, Reed & McCreary, PLLC**
16 Public Square North
P.O. Box 884
Murfreesboro, TN 37133
jmccreary@mborolaw.com
nchristiansen@mborolaw.com

Alexander S. Rieger
**Office of the Attorney General and Reporter**
General Civil Division

P.O. Box 20207
Nashville, TN 37202
(615) 532-5683
alex.rieger@ag.tn.gov

Jonathan P. Lakey
**Pietrangelo & Cook, PLC**
6410 Poplar Avenue
Suite 190
Memphis, TN 38119
(901) 685-2662
jlakey@pcplc.com